**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180538-U

Order filed May 5, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0538 Circuit No. 06-CF-536 |
| | ) | |
| CORRIE WALLACE, | ) ) | Honorable Daniel Rippy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Justices McDade and O'Brien concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The circuit court erred by denying defendant leave to file his successive postconviction petition where defendant set forth a colorable claim of actual innocence.

¶ 2     Defendant, Corrie Wallace, appeals the Will County circuit court's denial of his motion for leave to file a successive postconviction petition. Defendant contends that he set forth a colorable claim of actual innocence. We reverse and remand.

¶ 3                                          I. BACKGROUND

¶ 4         This is the fourth appeal following defendant's convictions for first degree murder (720 ILCS 5/9-1(a)(1) (West 2006)) and aggravated battery with a firearm (*id.* § 12-4.2(a)(1)). Defendant was sentenced to consecutive terms of imprisonment of 70 years for first degree murder and 18 years for aggravated battery with a firearm. On direct appeal, we affirmed defendant's convictions and sentences. *People v. Wallace*, 2011 IL App (3d) 090500-U.

¶ 5         Following defendant's direct appeal on May 1, 2013, defendant filed an initial postconviction petition, which the trial court denied on June 14, 2013. Defendant appealed the denial of his first postconviction petition. This was the second appeal filed in this case. This court affirmed, and our mandate issued on May 10, 2016. Ten days later, on May 20, 2016, defendant filed a motion for leave to file a successive postconviction petition.

¶ 6         The trial court received the State's input before denying the motion for leave to file a successive postconviction petition. Following this denial, defendant appealed to this court for a third time. Our court reversed the trial court's decision denying defendant's motion for leave to file a successive postconviction petition and remanded to the trial court with directions to independently rule on defendant's motion for leave to file a successive postconviction petition. Following remand, the trial court denied defendant's motion to file a successive postconviction petition. Defendant is now challenging the trial court's ruling. This is defendant's fourth appeal following his conviction.

¶ 7                                          A. Trial Evidence

¶ 8         For purposes of this appeal, we summarize the evidence as recited in greater detail in our prior decision. *People v. Wallace*, 2011 IL App (3d) 090500-U, ¶¶ 10-31. The information contained in defendant's motion for leave to file a successive postconviction petition and the

2

proposed successive postconviction petition pertains to whether defendant was misidentified by an eyewitness as the shooter.

¶ 9        The trial evidence showed that Hallie Parrish was shot and killed while sitting in a parked car on March 1, 2006. At the time of Parrish's murder, Joe Williams, Charles McAfee, and Bishop Turner were also present in the parked car but could not identify the shooter. Tonya Dandridge, a neighbor, witnessed the shooting from the front of her house. She saw the shooter, but she did not know him. Shortly after the shooting, Dandridge thought she saw the shooter in the crowd, minus a face mask, and she pointed him out to her friend, Amanda Winters, by saying something about how the person was "the guy." Winters replied, "that's [Wallace]." Winters corroborated Dandridge's version of the circumstances surrounding Dandridge's discovery of defendant's name.

¶ 10       Dandridge provided law enforcement with a description of both the shooter and the shooter's clothing. Dandridge also identified defendant as the shooter after viewing a photographic lineup. Dandridge later told a defense investigator that she was only 50% confident of her selection. By the time of trial in 2008, Dandridge told the jury she was 100% confident that she correctly identified defendant's photo as the shooter. She testified that she lied to the investigator about being only 50% certain because she was scared and wanted to end the interview quickly. Dandridge stated she was able to see the shooter's face even though she was not wearing her corrective prescription eyeglasses for nearsightedness.

¶ 11       After the shooting, Zatella Bridges, who suffers from cataracts, saw a masked man approach the parked car and heard this masked man say, "who bad now?" According to Bridges, she watched the man remove his mask and saw that it was defendant. She later selected defendant's photo as one of two photos she believed might have been the unmasked shooter. At

3

the time of her in-court testimony, Bridges was recovering from a stroke that previously impacted her memory.

¶ 12    Officer Jeffrey Stubler testified that when he arrived at the scene, a crowd of approximately 50 people had gathered around the parked car. Stubler saw defendant in this crowd with David Woods. Defendant was wearing black pants and a black shirt. Stubler detained defendant, and another officer transported defendant to the police station. A detective took swabs of defendant's hands. The swabs tested positive for the presence of gunshot residue.

¶ 13    Several recordings of phone conversations defendant had while incarcerated and awaiting trial were introduced into evidence. In these recordings, defendant instructed his mother to tell witnesses to say various things that were favorable to his defense.

¶ 14    David Woods testified that he and defendant had been at Tamisha Davenport's house on the day of the shooting. At the time of the shooting, Woods was standing on a street corner with defendant. Approximately one week after the shooting, Woods told law enforcement that he and defendant had been on the street corner at the time of the shooting.

¶ 15    Two years after the shooting, Woods wrote a letter to the State and agreed to give a videotaped statement identifying defendant as the shooter. On videotape, Woods told the officer that on the day of the murder, defendant received a call from Conley Ratcliffe reporting that Parrish was in the area. Thereafter, Woods watched defendant grab a mask and a handgun before leaving Davenport's residence. Woods told the officer that defendant shot and killed Parrish. Phone records documented Ratcliffe's telephone was used to call defendant's telephone shortly before the shooting. This video recording was published to the jury. During his trial testimony, Woods recanted his videotaped statement and asserted that his original statement to the police exonerating defendant was the truth.

¶ 16    During the course of the investigation, police discovered defendant possessed a key to Davenport's residence. The key was located on defendant's person at the time of arrest. When law enforcement conducted a search of Davenport's residence, the police found a black face mask in a kitchen drawer. DNA from defendant and two other individuals was present on the black face mask. In addition, ammunition and loaded magazines were found under a couch cushion and also inside a closet at Davenport's residence. According to a firearms examiner, at least one of the unfired cartridges found under the couch cushion could be linked to the same gun that was used to kill Parrish.

¶ 17    The State called Ratcliffe as a witness. Ratcliffe was incarcerated at the time of the trial. Ratcliffe stated that his nickname was C-Note. Ratcliffe did not recall if he was out of prison on the day of the incident. Ratcliffe's testimony was brief and primarily concerned the fact that he used a cell phone that was in someone else's name.

¶ 18    Kylnita Redmond testified for the defense. She was an eyewitness to the shooting and described that the shooter wore a gray mask and clothing that was either gray and white or black and white. Redmond saw defendant arrive at the scene 30 to 40 seconds after the shooting was over. Defendant was wearing different clothing in comparison to what she saw the shooter wearing. Further, she said the shooter was not the same height as defendant.

¶ 19            B. 2016 Motion for Leave to File Successive Postconviction Petition

¶ 20    On May 20, 2016, defendant filed a motion for leave to file a successive postconviction petition together with a successive postconviction petition. The pleading was supported by the affidavits of Deonte Pinnick, Rondale Ellis, Sharie Summit, and Jimmie Barlow.

¶ 21    Ellis's affidavit, dated May 24, 2013, stated that Ellis saw Ratcliffe running away from the scene of the shooting while carrying both a gun and a mask. He saw defendant in a crowd of

5

people who had gathered around the car after the shooting. Ellis saw an officer arrest defendant and told the officer that defendant was not the shooter. The officer took down Ellis's name and telephone number but the police did not contact Ellis.

¶ 22 Summit's affidavit, dated May 15, 2015, stated that Ratcliffe apologized to her a few days after the shooting. Ratcliffe said he was sorry for committing the shooting after having been at her house. Ratcliffe told Summit that he shot "Holly James" in retaliation for Ratcliffe being shot in the neck.

¶ 23 Barlow's affidavit, dated February 1, 2016, stated that on the day of the incident, "Hallie James," the victim, was circling the block in a car while shouting at gang members present in the neighborhood. Barlow saw Ratcliffe fire a gun into the victim's car numerous times and then run away. Seconds later, Barlow saw defendant near the car after the shooting. Defendant's clothing did not match the clothing Barlow saw Ratcliffe wearing at the time of the shooting.

¶ 24 Pinnick's affidavit, dated May 23, 2013, stated that, on the date of the incident, he saw Ratcliffe, also known as "C-Note," rather than defendant, run over to the victim's car and shoot into the car.[1] Approximately 30 seconds after the shooting, Pinnick and defendant approached the victim's car at approximately the same time. After the police detained and handcuffed defendant, Pinnick told the police that defendant was not involved in the shooting. In response, the officer asked Pinnick whether Pinnick wanted to join defendant.

¶ 25 Defendant's proffered successive postconviction petition alleged Pinnick's affidavit was newly discovered evidence because it was discovered after the trial. With respect to due diligence, defendant alleged that Pinnick did not want to be found after the police threatened him. According to defendant, no amount of due diligence could have produced Pinnick as a

---

[1]Pinnick's affidavit spelled the individual's name as "Ratcleaf" rather than "Ratcliffe" and referred to the victim as "Hollie James" rather than "Hallie Parrish."

6

witness after the intimidation by the police at the scene. Defendant alleged that defendant did not receive affidavits from Pinnick or Ellis until after the filing of defendant's initial postconviction petition. Defendant further alleged he did not have an opportunity to amend the postconviction petition because it was dismissed before the second stage.

¶ 26 The court denied defendant's motion for leave to file a successive postconviction petition. Defendant appealed. This court reversed the trial court's ruling due to prior participation by the State before the trial court's decision. The matter was remanded to the trial court. *People v. Wallace*, No. 3-16-0524 (2018) (unpublished order under Supreme Court Rule 23(c)).

¶ 27 On remand, following an independent assessment of the motion, the trial court denied defendant's motion for leave to file a successive postconviction petition. Defendant now appeals.

¶ 28 II. ANALYSIS

¶ 29 A defendant attempting to file a successive postconviction petition must obtain leave of court and must submit enough documentation to allow the court to determine whether leave should be granted. *People v. Edwards*, 2012 IL 111711, ¶ 24. Where a defendant seeks leave to file a successive postconviction petition raising a claim of actual innocence, "leave of court should be denied only where it is clear, from a review of the successive petition and the documentation provided by the petition that, as a matter of law, the petitioner cannot set forth a colorable claim of actual innocence." *Id.* That is, "leave of court should be granted when the petitioner's supporting documentation raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

¶ 30 Defendant argues that the circuit court erred by denying him leave to file a successive postconviction petition because he set forth a colorable claim of actual innocence based on the

affidavits of Pinnick, Ellis, Summit, and Barlow. "The elements of a claim of actual innocence are that the evidence in support of the claim must be 'newly discovered'; material and not merely cumulative; and of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 32. Claims of actual innocence "must be supported 'with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' " *Id.* (quoting *Schlup*, 513 U.S. at 324). "Newly discovered evidence is evidence that was unavailable at trial and could not have been discovered sooner through due diligence." *People v. Harris*, 206 Ill. 2d 293, 301 (2002).

¶ 31        We find that the circuit court erred by denying defendant leave to file his postconviction petition because defendant set forth a colorable claim of actual innocence based on Pinnick's affidavit. After careful review of the record, we conclude that defendant has made a sufficient showing that Pinnick's affidavit was newly discovered evidence that could not have been discovered earlier through the exercise of due diligence.

¶ 32        Defendant alleged in his proffered petition that Pinnick's affidavit was discovered after the trial. Defendant also observed that Pinnick did not want to be found after he was threatened by the police. Defendant also stated that he could not submit the petition in the initial postconviction proceedings because his petition was dismissed prior to the second stage of proceedings.

¶ 33        We reject the State's argument that defendant could have discovered the information contained in Pinnick's affidavit earlier because defendant should have noticed that Pinnick was present in the crowd at the scene. Even if defendant saw Pinnick in the gathering of approximately 50 people, defendant would not have known whether Pinnick had seen the shooting or could identify the shooter. For example, there were other people located in the area,

8

such as the passengers within the parked car at the time of the shooting, that were present but could not identify the shooter.

¶ 34    We also reject the State's argument that Pinnick's affidavit was not newly discovered evidence because it was dated May 23, 2013, which was prior to the dismissal of the initial postconviction petition. A careful review of the record shows that defendant's initial postconviction petition was filed on May 1, 2013, and the court took the petition under advisement on May 21, 2013. After taking the matter under advisement, the court set a status date for June 13, 2013, presumably for the announcement of the court's ruling. On June 14, 2013, the trial court entered an order dismissing defendant's postconviction petition. Although it is unclear as to the actual date when defendant received Pinnick's affidavit, Pinnick's affidavit was signed and dated two days after the trial court took the matter under advisement on May 21, 2013. Hence, defendant could not have amended the postconviction petition after the court took the matter under advisement.

¶ 35    On June 27, 2013, defendant filed a timely notice of appeal, and this court affirmed the trial court's 2013 dismissal of the initial postconviction petition. The mandate was issued by our court on May 10, 2016. Just ten days later, on May 20, 2016, defendant filed his motion for leave to file a successive postconviction petition, together with Pinnick's affidavit. Based on these chronological events, defendant's explanation regarding his due diligence resonates with this court. We find defendant has provided a sufficient explanation for the reason Pinnick's affidavit was not submitted to the trial court during the initial postconviction proceedings. Next, we turn to a consideration of the contents of Pinnick's affidavit.

¶ 36    Pinnick claims in his affidavit that he was an eyewitness to the shooting and saw Ratcliffe, rather than defendant, commit the murder. In this respect, Pinnick's affidavit directly

9

contradicts the identification testimony presented to the jury by Dandridge. Dandridge's self-stated level of uncertainty about the accuracy of her selection of defendant's photograph from a photo array was problematic for the State. The other identification witness, Bridges, did not actually see the shooting but said that she saw defendant approach the victim's car after the shooting. Bridges testified that she had problems with her memory due to a stroke. She could not single out one photo and picked two photographs as the potential shooter. Woods named defendant as the shooter two years after Parrish's death but recanted defendant's participation in the murder during his trial testimony. The remaining evidence connecting defendant to the offense as the shooter was circumstantial. Based on our review, Pinnick's affidavit casts the circumstantial evidence and the identification testimony in a new light.

¶ 37        We reject the State's argument that Pinnick's affidavit was not conclusive and was inherently unreliable because Pinnick and defendant were incarcerated at the same time. This circumstance, if accurate, potentially impacts Pinnick's credibility, but credibility is not a consideration for this court when reviewing the denial of a motion for leave to file a successive postconviction petition. See *People v. Sanders*, 2016 IL 118123, ¶ 42. ("Credibility determinations may be made only at a third-stage evidentiary hearing.") While the ultimate success of defendant's actual innocence claim in the trial court will turn on the credibility of the witnesses, we accept the contents of Pinnick's affidavit as true at this preliminary stage.

¶ 38        Accepting the contents of Pinnick's affidavit as true, it is very apparent that this information does not constitute cumulative evidence, as no other witness at the trial claimed to see Ratcliffe commit the offense. We conclude Pinnick's affidavit contains material, noncumulative evidence that, if accepted by the trier of fact as credible, would probably change the result on retrial. Based on our review of this single affidavit, we conclude defendant

10

presented a colorable actual innocence claim and reverse the order denying defendant's request for leave to file a successive postconviction petition based on actual innocence. Consequently, on remand, our decision does not foreclose defendant from supporting and fortifying his actual innocence claim with the other 2013 affidavit from Ellis and the later affidavits from Summit and Barlow.

¶ 39                                  III. CONCLUSION

¶ 40        In conclusion, the trial court's order denying defendant's request to file a successive postconviction petition is reversed. The matter is remanded to the trial court with directions to allow defendant leave to file the successive postconviction petition attached to the pleading and for further postconviction proceedings.

¶ 41        Reversed and remanded.